OPINION
{¶ 1} Plaintiffs-appellants, Heather Herzner and Bonnie Pettit, appeal a decision of the Clermont County Court of Common Pleas granting summary judgment to defendant-appellee, Fischer Attached Homes, Ltd., in an action to recover for bodily injuries arising out of the negligent construction of a residence. For the reasons outlined below, we affirm the *Page 2 
decision of the trial court.
 {¶ 2} In September 2002, appellant Herzner moved into a Milford condominium ("condo") constructed by appellee, Fischer Attached Homes ("Fischer"). Herzner reported problems with water intrusion and mold in the ground level condo. She maintains that she became increasingly ill as a result of mold exposure. After attempts to remedy the water intrusion by the property management company and Fischer were unsuccessful, Herzner moved out of the residence in August 2003.
 {¶ 3} Herzner commenced this action in April 2004. In November 2006, Fischer filed a motion to exclude the testimony of Herzner's medical expert, Dr. Ritchie Shoemaker. Following a hearing, the trial court granted the motion. Fischer subsequently moved for summary judgment, which the trial court granted. Herzner and Pettit[1] (collectively, "appellants") timely appeal, raising one assignment of error.[2]
 {¶ 4} Assignment of Error No. 1:
 {¶ 5} "THE TRIAL COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF PLAINTIFFS-APPELLANTS BY EXCLUDING THE EXPERT TESTIMONY OF DR. RITCHIE SHOEMAKER, M.D."
 {¶ 6} Appellants retained Dr. Shoemaker, a family practitioner who claims to specialize in the health effects of exposure to mycotoxins,[3] to testify in support of their claim that the negligent construction of Herzner's condo caused her to become sick. Appellants challenge a number of the trial court's reasons for excluding Dr. Shoemaker's testimony, arguing that the court imposed a higher standard than that required for determining the *Page 3 
scientific validity of the testimony.
 {¶ 7} A trial court's decision on whether to admit or exclude expert testimony will not be reversed absent an abuse of discretion. State v.Jones, 90 Ohio St.3d 403, 414, 2000-Ohio-187. An abuse of discretion connotes an arbitrary, unreasonable, or unconscionable decision by the trial court. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 8} It is undisputed that Dr. Shoemaker's testimony related to matters beyond the knowledge or experience of laypersons and that Dr. Shoemaker qualified as a medical expert. Evid. R. 702(A) and (B). At issue was the reliability of Dr. Shoemaker's testimony. The trial court excluded Dr. Shoemaker's testimony under Evid. R. 702(C), which provides that expert testimony must be based upon reliable scientific, technical, or other specialized information in order to be admissible.
 {¶ 9} In keeping with Evid. R. 702(C), expert testimony should be admitted only where it is established that the principles and methods underlying the testimony are scientifically valid. Valentine v.Conrad, 110 Ohio St.3d 42, 2006-Ohio-3561, ¶ 16; Miller v. Bike AthleticCo., 80 Ohio St.3d 607, 611, 1998-Ohio-178; Daubert v. Merrell DowPharmaceuticals, Inc. (1993), 509 U.S. 579, 589, 113 S.Ct. 2786. This ensures that the testimony assists the trier of fact in understanding the evidence or determining a factual issue. Valentine at ¶ 17. In making this inquiry, the trial court considers several factors, including: "(1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance." Miller at 611. The focus is not on the substance of the expert's conclusions, but on how the expert arrived at his conclusions. Valentine at ¶ 16.
 {¶ 10} The trial court cited numerous reasons in support of its ruling that Dr. Shoemaker's expert evidence was not scientifically valid. Among these reasons was the lack of evidence demonstrating Herzner's exposure to mold toxins. Michael Crandall of Indoor *Page 4 
Environmental Services ("IES") performed an assessment of Herzner's condo in November 2003. Crandall identified a number of mold spores in the condo that were capable of producing mycotoxins. However, no tests were performed to determine whether the mold spores were in fact producing mycotoxins. In diagnosing Herzner with "mold illness,"[4]
Dr. Shoemaker inferred from the IES report that the mold in Herzner's residence produced mycotoxins that in turn caused her illness.
 {¶ 11} The IES tests were conducted three months after Herzner had vacated the condo. There was no evidence that the mold spores detected by Crandall were present while Herzner occupied the premises. Even if the mold spores were present, there was no evidence that they were producing mycotoxins during Herzner's occupancy. Dr. Shoemaker conceded in his deposition that mold capable of producing toxins can be present in a location without producing any mycotoxins. The trial court concluded that there was too great a gap between the data and Dr. Shoemaker's opinion that Herzner suffered from exposure to toxins in the condo to admit Dr. Shoemaker's testimony.
 {¶ 12} The trial court also excluded Dr. Shoemaker's testimony on the basis that there was insufficient evidence of a reliable scientific link between exposure to toxin-producing molds and "mold illness," as defined by Dr. Shoemaker. Appellants produced no evidence that Dr. Shoemaker's testing methods or his theory on the contraction of "mold illness" had been tested or peer reviewed by other experts in the field outside those in Dr. Shoemaker's physician group. Furthermore, appellants presented no scientific literature to support the manner in which Dr. Shoemaker utilized physiologic tests to support his diagnosis of "mold illness."
 {¶ 13} The trial court also observed a number of flaws in Dr. Shoemaker's use of *Page 5 
differential diagnosis, insisting that he relied upon laboratory tests in a manner that was not reliable or based upon generally accepted scientific principles. Rather than involving the systematic elimination of other possible causes for Herzner's symptoms, Dr. Shoemaker's differential diagnosis merely reflected his own opinion and unverified interpretation of laboratory results. See Terry v. Ottawa Cty. Bd. ofMental Retardation Dev. Delay, 165 Ohio App.3d 638, 2006-Ohio-866, ¶ 59-61, reversed on other grounds; Valentine, 2006-Ohio-3561
at ¶ 22-23.
 {¶ 14} The trial court also challenged Dr. Shoemaker's conclusion that the condo built by Fischer was the specific cause of Herzner's "mold illness." Herzner began seeing Dr. Shoemaker one year after she vacated the condo. Appellants failed to produce any evidence about the environment Herzner was exposed to during that year. In addition, the trial court reasoned that the test employed by Dr. Shoemaker involving re-exposure to the condo after Herzner had been treated was not reliable. This was because appellants failed to present evidence that Herzner was exposed to mold toxins during her habitation in the condo or during her re-exposure when she returned to the condo. As stated, the condo was never actually tested for the presence of mycotoxins. Dr. Shoemaker's inferences, tests, and conclusions thus lacked an adequate scientific basis in order to support their validity and enable the admission of his testimony.
 {¶ 15} The trial court's thorough and well-reasoned analysis exposed numerous faults in the principles and methods utilized by Dr. Shoemaker to draw his conclusions. We conclude that the trial court did not abuse its discretion in granting Fischer's motion to exclude the testimony of Dr. Shoemaker. Appellants' single assignment of error is overruled.
 {¶ 16} Judgment affirmed.
BRESSLER, P.J. and POWELL, J., concur.
[1] Bonnie Pettit, Herzner's sister, is the party who contracted with the former owners for the purchase of the condo for the benefit and primary residence of Herzner.
[2] Appellants set forth two assignments of error in their appellate brief, but voluntarily withdrew the first assignment of error at oral argument.
[3] Per the trial court's decision, "[m]ycotoxins are toxic chemicals sometimes produced by certain mold species."
[4] According to the trial court's decision, Dr. Shoemaker defined "mold illness" as a chronic, biotoxin-associated illness caused by exposure to water-damaged buildings with resident toxin-producing organisms. *Page 1