[Cite as *Hunt v. E. Cleveland*, 2019-Ohio-1115.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 105953**

**CHARLES HUNT, ET AL.**

PLAINTIFFS-APPELLEES

vs.

**CITY OF EAST CLEVELAND, ET AL.**

DEFENDANTS-APPELLANTS

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-11-755540

**BEFORE:** E.A. Gallagher, J., Kilbane, A.J., and Sheehan, J.

**RELEASED AND JOURNALIZED:** March 28, 2019

**ATTORNEYS FOR APPELLANTS**

Willa M. Hemmons
Law Director, City of East Cleveland

Heather McCollough
Assistant Law Director
City of East Cleveland
14340 Euclid Avenue
East Cleveland, Ohio 44122


**ATTORNEYS FOR APPELLEES**

Robert F. DiCello
Justin J. Hawal
DiCello Levitt & Casey L.L.C.
7556 Mentor Avenue
Mentor, Ohio 44060


EILEEN A. GALLAGHER, J.:

{¶1} Defendants-appellants Todd Carroscia and the city of East Cleveland (collectively, "appellants") appeal from a jury verdict in favor of plaintiffs-appellees Charles Hunt and Marilyn Conard (collectively, "appellees") resulting from an automobile accident in which a patrol vehicle driven by East Cleveland Police Officer Todd Carroscia collided with a vehicle driven by Hunt. For the reasons that follow, we affirm the trial court's judgment.

**Factual Background and Procedural History**

{¶2} On October 5, 2008, at approximately 2:00 a.m., East Cleveland police officers Todd Carroscia and Scott Gardner were positioned in separate patrol cars outside of a Cleveland cocktail lounge when a call came in over the radio from another officer, Officer Jonathan O'Leary, indicating that he was following a possibly stolen motorcycle. Officers Carroscia and Gardner responded to the call. On the way to the location of the reportedly stolen motorcycle,

Officer Carroscia's vehicle struck the driver side of Hunt's vehicle. Conard was the front seat passenger in Hunt's vehicle. Hunt and Conard were seriously injured in the accident.

{¶3} Hunt and Conard filed a complaint in the Cuyahoga County Court of Common Pleas against East Cleveland (the "city"), Officer Carroscia and others, alleging that Officer Carroscia's operation of his police vehicle constituted willful, wanton and/or reckless misconduct that caused the accident and their injuries.[1] In April 2017, the case proceeded to a jury trial. A summary of the relevant evidence presented at trial follows.

{¶4} Officer Carroscia testified that as he approached the intersection of East 140th Street and St. Clair Avenue on his way to the location of the reportedly stolen motorcycle, he had his overhead lights and sirens activated and was "looking for any type of hazard that might cause [him] an issue." He testified that he believed he was traveling approximately 40 to 50 miles per hour as he approached the intersection. He acknowledged that during the police department's investigation of the accident, he told the investigating officer that he had been traveling approximately 60 to 65 miles per hour.

{¶5} East Cleveland categorizes calls for assistance into various levels, i.e., Code One, Code Two and Code Three. A Code One call is a "routine call," such as a call for service or a minor disturbance. A Code Two call is an "urgent call," i.e., the call is to be answered immediately but lights and sirens are not to be used and "all traffic laws shall be obeyed." A

---

[1] This case, originally filed in 2009, has a lengthy procedural history. It includes a dismissal without prejudice, a refiling in 2011, a removal to federal district court, a decision by the district court granting summary judgment on all federal claims and remanding the state law claims, appellees' dismissal of their claims against several defendants and the trial court's entry of partial summary judgment in favor of the remaining defendants, resolving all state law claims except the claim at issue against Officer Carroscia and East Cleveland. *See Hunt v. Cleveland*, 8th Dist. Cuyahoga No. 103468, 2016-Ohio-3176, ¶ 8-10. Most recently, this court affirmed the trial court's decision denying appellants' motion for summary judgment on immunity grounds, concluding that genuine issues of material fact existed concerning whether Officer Carroscia "operated his zone car in a wanton, willful, or reckless manner." *Id.* at ¶ 28.

Code Three call is an "emergency call," requiring the use of emergency lights and sirens, to be answered "immediately but in a manner which will enable the units to reach the scene as quickly and safely as possible."

{¶6} Officer Carroscia testified that he viewed Officer O'Leary's call as a Code Three call, requiring the use of emergency lights and sirens. According to Officer Carroscia, as he approached the intersection of East 140th Street and St. Clair Avenue, he had a green light. He could not say whether he slowed down as he approached the intersection (other than to say he "might have been going 55 and slowed down to 50"), but indicated that there was no reason to do so because he had a green light and he had "no obstructions in that roadway whatsoever" — until Hunt's vehicle pulled out in front of him, entering the intersection to his right. Officer Carroscia stated that he attempted to avoid hitting Hunt's vehicle by braking and steering to the left, but that he was unsuccessful and the vehicles collided.

{¶7} Commander Gardner (then Sergeant Gardner) was driving his vehicle a short distance behind Officer Carroscia's vehicle. Commander Gardner did not know the precise distance between his vehicle and Officer Carroscia's vehicle, but stated that he was "close enough to observe everything that was happening" and saw the accident unfold. Commander Gardner indicated that the speed limit on the portion of St. Clair Avenue they were traveling was 25 or 35 miles per hour. He acknowledged that both he and Officer Carroscia were speeding but could not state at what speed the vehicles were traveling.

{¶8} Commander Gardner testified that he responded to the call as a Code Three call because he believed "a solo officer by himself with a possible stolen vehicle would warrant a Code Three lights and sirens response." He stated that both he and Officer Carroscia had their

emergency lights and sirens activated as they pulled out of the parking lot and headed toward the location of the allegedly stolen motorcycle.

{¶9} Sergeant Cargile also proceeded to the location of the reportedly stolen motorcycle after hearing Officer O'Leary's communications with dispatch. He testified that he responded to the call as a Code Two call. Officer O'Leary testified that he likewise considered the call to be a Code Two call.

{¶10} According to Commander Gardner, as he and Officer Carroscia approached the intersection of East 140th Street and St. Clair Avenue, "[t]here was no need to brake or slow down at that point" because there was no traffic on St. Clair Avenue and they were proceeding through a green light. Commander Gardner testified that Hunt's vehicle came "out of nowhere," speeding through the intersection and failing to stop at the red light controlling traffic in his direction. Commander Gardner testified that he saw Officer Carroscia brake and "go left of center" in an attempt to avoid contact with Hunt's vehicle but that he was unsuccessful and the two vehicles collided. According to Commander Garner, the crash occurred at such a high velocity that the back end of Officer's Carroscia's vehicle lifted up upon impact with Hunt's car, then slammed down and pushed Hunt's car across the intersection into a sign for the Marathon gas station located on the corner of the intersection.

{¶11} Under East Cleveland's emergency driving policy, a public safety vehicle responding to an emergency call approaching an intersection on a green light is to "slow down to a safe, reasonable speed," "be alert for pedestrians that may have entered the crosswalk or traffic that may not be stopping for the red light" and "proceed with caution." When approaching an intersection on a red light, a public safety vehicle responding to an emergency call is to "come to

a complete stop to request that all traffic and pedestrians yield the right-of-way to [the public safety] vehicle" and "only then * * * proceed, maintaining extreme caution."

{¶12} At the time of the accident, Officer Carroscia's driver's license was suspended for failure to pay child support. Officer Carroscia testified that he did not learn that his driver's license had been suspended until after the accident.

{¶13} Hunt testified that the evening before the accident, he was at a sports banquet at the Fireside Lounge from 9:00 p.m. until 1:00 a.m. Hunt stated that he had "a beer or two, a couple drinks" and that he was "dancing and just having a good time." Hunt testified that he left the Fireside Lounge after he received a call from Conard asking for a ride. He picked Conard up and was driving to a gas station to get cigarettes, traveling northwest on East 140th Street, when the accident occurred. Hunt testified that he did not see any emergency lights or hear any police sirens as he approached the intersection of East 140th Street and St. Clair Avenue. He stated that there were two overhead traffic lights, hanging side by side, controlling his direction of travel. One traffic light was functioning with a green light and the other light, to its right, was "just black." Hunt stated that because the light on the right was not functioning, he glanced to the right as he entered the intersection on the green light, "just to make sure wasn't nobody coming down the street." He stated that he did not have a chance to look to the left. After looking to the right, and confirming that no one was coming down St. Clair Avenue in that direction, Hunt next remembered waking up in the hospital.

{¶14} Conard testified that Hunt picked her up from a girlfriend's house in the early morning of October 5, 2008 after he called her and offered to give her a ride home. Conard indicated that she did not see any emergency lights or hear any sirens as they approached the intersection. Conard testified that they had a green light as Hunt entered the intersection and

that she saw it "plain as day." She stated that if she had seen lights or heard sirens, she would have told Hunt to stop because he "wasn't going fast to where he couldn't stop." As Hunt pulled into the intersection, Conard heard a "bam." She then "blacked out."

{¶15} Stromboli Douglas was pumping gas at the Marathon gas station on the corner of East 140th Street and St. Clair Avenue at the time of collision. He testified that as he was pumping gas, he heard a "vrroom sound," i.e., the sound of a hemi engine of a car. He looked up and saw a black police vehicle (later identified as Officer Carroscia's patrol vehicle) "riding up" at "like 70 miles per hour" on St. Clair Avenue. He stated that the police vehicle did not have its emergency lights or sirens activated. He also saw a light-colored vehicle (later identified as Hunt's vehicle) approaching the intersection from East 140th Street, traveling "at a normal speed." Douglas stated that the intersection was well-lit and that, from his vantage point, he had an unobstructed view of the overhead traffic signals for both the southbound traffic on St. Clair Avenue and the traffic heading southeast on East 140th Street toward St. Clair Avenue. Douglas testified that at the time of the collision, vehicles traveling southeast on East 140th Street toward St. Clair had a green light and vehicles traveling southbound on St. Clair Avenue had a red light. Although he could not see the traffic signal Hunt would have been facing as he traveled northwest on East 140th Street, Douglas testified that he was familiar with the intersection and that the traffic signals were the same for traffic heading southeast and northwest on East 140th Street.

{¶16} Douglas testified that he saw both vehicles travel toward the intersection without stopping, but did not see the collision. He lost sight of the vehicles when they passed behind some bushes and the sign for the gas station. However, he heard a "loud boom" from the impact. When he went to see what had happened, he saw that Officer Carroscia's vehicle had

struck Hunt's vehicle and had pushed it into the sign for the gas station. Douglas testified that there were a number of clubs and bars in the area and that "a lot of people" came out of the clubs and bars and surrounded the gas station after they heard the crash.

{¶17} Hunt and Conard sustained serious injuries in the accident and were taken to the hospital. At approximately 2:45 a.m., hospital staff took a sample of Hunt's blood to perform a blood serum alcohol test in connection with his medical care and treatment. At approximately 3:30 a.m., Hunt's blood serum alcohol level was reported to be 125 milligrams per deciliter. Appellants sought to introduce expert testimony from Dr. Heath Jolliff, a medical toxicologist and emergency medicine physician, that, based on these test results, Hunt was "impaired" and unable to operate a vehicle safely at the time of the accident. However, the trial court precluded a portion of Dr. Jolliff's testimony regarding Hunt's alleged impairment at the time of the accident.

{¶18} Although both Officer Carroscia and Commander Gardner's vehicles were equipped with video equipment, the equipment was not recording at the time of the accident.

{¶19} Appellees' accident reconstruction expert, Detective Mark Rice with the Columbus Police Department's Accident Investigation Unit, reconstructed the crash after the accident. He opined that Officer Carroscia was traveling a minimum of 70 miles per hour and that Hunt was traveling a minimum of 18 miles per hour at the point of impact. He further opined that Officer Carroscia had operated his patrol vehicle with a "perverse disregard for the safety of persons and property" in violation of applicable policies and procedures.

{¶20} East Cleveland's former law director similarly testified that, in her view, Officer Carroscia had not followed the city's policies and procedures and had acted "recklessly" in

traveling at that "high rate of speed." As she explained, she had recommended that Officer Carroscia be terminated for his actions:

> As I recall the facts, there was an officer following a car on the east side of the city that he radioed in the plates and got information that it was a stolen vehicle. He said I'm following this vehicle and going to try and stop it. He later got a rad — a dispatch from the, from the officers that this car was not stolen. I don't recall whether that was before or after he had stopped it.

> I think that was about the time of the crash at 140th and Saint Clair. I learned that Carroscia was over on Superior at one of the bars, he and Gardner, overseeing the closing of a bar. I guess they had some reason to think something might have happened there that evening and when they heard this, wow, they took off like bats out of hell running over there for absolutely no reason that I could tell. I mean nobody asked them to come, there was no radioing of a need for any assistance. It was just, it was almost like cowboys and Indians, there's the Indians, let's go after them and I thought that was not good judgment. I thought that was evidence of a kind of seeking excitement that ends up in getting a lot of people killed. Clearly to be running at high speed — I don't know whether his siren was on or not. He says it was. I don't know if his lights was [sic] flashing or not. He says it was — but to be speeding through the streets of our city endangering our citizens without good reason was a reason for my wanting him no longer working for the City of East Cleveland.

{¶21} Ten days after the accident, Officer Carroscia was terminated for "failure to meet probationary standards." There was a dispute as to whether Officer Carroscia was actually on probation at the time he was fired and he was later reinstated.

{¶22} On April 27, 2017, after hearing all the evidence, the jury returned a verdict in favor of Hunt and Conard. The jury awarded Hunt $6,119,738 in compensatory damages and Conard $1,590,442 in compensatory damages against appellants. The jury also awarded Hunt and Conard each $500,000 in punitive damages against Officer Carroscia.

{¶23} On May 24, 2017, appellants filed a motion for judgment notwithstanding the verdict or, alternatively, for a new trial. Appellants argued that appellees failed to present sufficient evidence that Officer Carroscia had operated his police vehicle in a wanton, reckless or

wilful manner or that his actions were the proximate cause of appellees' injuries. Appellants also argued that they were entitled to a new trial based on allegations of juror misconduct and a series of alleged "cumulative errors," including the exclusion of evidence relating to the effect of Hunt's alcohol consumption, appellees' "withdrawal" of their videotaped cross-examination of appellants' expert, several alleged errors in the jury instructions and the trial court's failure to bifurcate liability and damages issues. On June 15, 2017, appellees filed a motion for prejudgment interest.

{¶24} On June 28, 2017, the trial court entered judgment on the jury's verdict. The city and Officer Carroscia appealed, raising eight assignments of error for review:

ASSIGNMENT OF ERROR NO. I:
The trial court abused its discretion when it denied appellants' motion to bifurcate the trial.

ASSIGNMENT OF ERROR NO. II:
The trial court abused its discretion when it advocated for a minimum dollar verdict and thereby recused a juror for cause.

ASSIGNMENT OF ERROR NO. III:
The trial court erred to appellants' prejudice when it refused to allow Dr. Heath [Jolliff's] expert opinion on impairment.

ASSIGNMENT OF ERROR NO. IV:
The trial court abused its discretion when it refused admission of a key witness's criminal record.

ASSIGNMENT OF ERROR NO. V:
The trial court erred to appellants' prejudice when it allowed patent juror misconduct in the courtroom.

ASSIGNMENT OF ERROR NO. VI:
The verdict went against the manifest weight of the evidence when testimony showed that Charles Hunt when facing a malfunctioning traffic light did not look to the left, in the direction of the oncoming police car, prior to entering the intersection.

ASSIGNMENT OF ERROR NO. VII:

The trial court erred to the prejudice of appellants when it disallowed evidence of insurance and government subsidy offsets to victims['] medical and living costs.

ASSIGNMENT OF ERROR NO. VIII:
The trial court erred in failing to grant appellants' motion for a new trial.

**{¶25}** Pursuant to App.R. 4(B)(2), this court remanded the case to the trial court for rulings on appellants' motion for judgment notwithstanding the verdict or a new trial and appellees' motion for prejudgment interest. On June 13, 2018, the trial court summarily denied appellants' motion for judgment notwithstanding the verdict or a new trial.

**{¶26}** On December 11, 2018, the trial court granted appellees' motion for prejudgment interest and awarded Hunt $1,958,316.16 in prejudgment interest and Conard $508,941.44 in prejudgment interest pursuant to R.C.1343.03(C)(l)(c)(i). According to the trial court, it awarded prejudgment interest "from the date that the case was first filed on March 10, 2009 to the date that the judgment was rendered on April 27, 2017 [sic]." Appellants did not appeal that ruling. Instead, on December 17, 2018, appellants filed an "opposition to order granting prejudgment interest" with this court, asserting that the trial court had erred in awarding prejudgment interest dating back to March 10, 2009 — the date the original complaint was filed — instead of May 18, 2011 — the date instant, refiled action was filed.

**{¶27}** Filing an "opposition" is not a proper means of challenging a trial court's ruling on appeal. Because appellants did not move to amend their notice of appeal or file a new notice of appeal challenging the trial court's award of prejudgment interest within 30 days of the entry of the trial court's order, *see* App.R. 4(B)(2), appellants' "opposition" to the trial court's award of prejudgment interest is not properly before this court.

**Law and Analysis**

**Bifurcation of Compensatory and Punitive Damages Issues**

**{¶28}** In their first assignment of error, appellants contend that the trial court abused its discretion by denying their motion to bifurcate. Appellants argue that pursuant to R.C. 2315.21,

the trial court had a "mandatory duty" to bifurcate the trial of appellees' claim for punitive damages from the trial of its claim for compensatory damages.

{¶29} R.C. 2315.21(B) provides, in relevant part:

(1) In a tort action that is tried to a jury and in which a plaintiff makes a claim for compensatory damages and a claim for punitive or exemplary damages, *upon the motion of any party*, the trial of the tort action shall be bifurcated as follows:

(a) The initial stage of the trial shall relate only to the presentation of evidence, and a determination by the jury, with respect to whether the plaintiff is entitled to recover compensatory damages for the injury or loss to person or property from the defendant. During this stage, no party to the tort action shall present, and the court shall not permit a party to present, evidence that relates solely to the issue of whether the plaintiff is entitled to recover punitive or exemplary damages for the injury or loss to person or property from the defendant.

(b) If the jury determines in the initial stage of the trial that the plaintiff is entitled to recover compensatory damages for the injury or loss to person or property from the defendant, evidence may be presented in the second stage of the trial, and a determination by that jury shall be made, with respect to whether the plaintiff additionally is entitled to recover punitive or exemplary damages for the injury or loss to person or property from the defendant.

(Emphasis added.)

{¶30} Thus, R.C. 2315.21(B)(1) requires a party seeking bifurcation of punitive damages issues to file a motion for such prior to trial. *See Havel v. Villa St. Joseph*, 131 Ohio St.3d 235, 2012-Ohio-552, 963 N.E.2d 1270, ¶ 13 ("The plain language of R.C. 2315.21(B) creates no ambiguity regarding its application: a trial court, on the motion of any party, is required to bifurcate a tort action to allow presentation of the claims for compensatory and punitive damages in separate stages."). In this case, however, appellants did not file a motion to bifurcate compensatory and punitive damages. Appellants filed a motion to bifurcate liability and damages. It is well established that a party cannot claim as error an issue not raised below. *See, e.g., Glendell-Grant v. Grant*, 8th Dist. Cuyahoga No. 105895, 2018-Ohio-1094, ¶ 11;

*Cleveland Town Ctr., L.L.C. v. Fin. Exchange Co. of Ohio, Inc.*, 2017-Ohio-384, 83 N.E.3d 383, ¶ 21 (8th Dist.). Because appellants did not move to bifurcate compensatory and punitive damages, the trial court did not err in failing to bifurcate them. Accordingly, we overrule appellants' first assignment of error.

### Trial Court's Voir Dire Questioning and Excusal of Prospective Juror for Cause

{¶31} In their second assignment of error, appellants contend that the trial court "demonstrated a bias in favor of Plaintiffs" by: (1) "openly advocating for an eight figure judgment" when questioning potential jurors during voir dire and (2) excusing prospective juror No. 3 for cause after the juror indicated that he did not think he could award the plaintiffs an eight-figure judgment even if the evidence warranted it.

{¶32} The manner in which voir dire is to be conducted lies within the sound discretion of the trial court. *Gwen v. Regional Transit Auth.*, 8th Dist. Cuyahoga No. 82920, 2004-Ohio-628, ¶ 38 ("[A] trial court has 'great latitude in deciding what questions should be asked on voir dire.'"), quoting *State v. Twyford*, 94 Ohio St.3d 340, 345, 763 N.E.2d 122 (2002); *see also State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 72. "Questions on voir dire must be sufficient to identify prospective jurors who hold views that would prevent or substantially impair them from performing the duties required of jurors." *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 57. An appellate court will not find prejudicial error in the trial court's examination of potential jurors absent an abuse of discretion. *Id.* at ¶ 28; *State v. Jones*, 8th Dist. Cuyahoga No. 101311, 2015-Ohio-1818, ¶ 18.

{¶33} R.C. 2313.17 governs challenges of jurors for cause. R.C. 2313.17(B) lists nine "good causes for challenge to any person called as a juror." One of those "good causes" is that

"the person discloses by the person's answers that the person cannot be a fair and impartial juror or will not follow the law as given to the person by the court." R.C. 2313.17(B)(9).

{¶34} A challenge under R.C. 2313.17(B)(9) is a "principal challenge." *See* R.C. 2313.17(C). As this court explained in *Cordova v. Emergency Professional Servs.*, 2017-Ohio-7245, 96 N.E.3d 906 (8th Dist.):

> Under Ohio law, if a principal challenge is found valid, "the court [must] dismiss the prospective juror, [and may] not rehabilitate or exercise discretion to seat the prospective juror upon the prospective juror's pledge of fairness[.]" *State v. Swift*, 9th Dist. Summit No. 27084, 2014-Ohio-4041, ¶ 4, citing *Hall v. Banc One Mgt. Corp.*, 114 Ohio St.3d 484, 2007-Ohio-4640, 873 N.E.2d 290. "[W]here a party establishes the existence of facts supporting a principal challenge, this finding 'result[s] in automatic disqualification,' and no rehabilitation of the potential juror can occur." *Hall* at ¶ 29.

*Id.* at ¶ 27.

{¶35} In other words, although a trial court has discretion in determining the validity of the challenge for cause, if a trial court finds facts supporting a valid principal challenge under R.C. 2313.17(B)(9), i.e., that a potential juror would not be fair and impartial or would not follow the law as instructed by the court, the trial court must disqualify the individual as a juror under R.C. 2313.17(C).

{¶36} R.C. 2313.17(D) further provides, in relevant part:

> In addition to the causes listed in [R.C. 2313.17(B)], any petit juror may be challenged on suspicion of prejudice against or partiality for either party * * * or other cause that may render the juror at the time an unsuitable juror. The validity of the challenge shall be determined by the court and be sustained if the court has any doubt as to the juror's being entirely unbiased.

{¶37} The determination of whether a juror is impartial or biased involves a judgment of credibility, which may not be apparent from the record on appeal. Therefore, a reviewing court will defer to the trial judge who sees and hears the juror. *See, e.g., Chang v. Cleveland*

*Clinic Found.*, 8th Dist. Cuyahoga No. 82033, 2003-Ohio-6167, ¶ 6 ("'Trial courts have discretion in determining a juror's ability to be impartial.'"), quoting *State v. Nields*, 93 Ohio St.3d 6, 35-36, 752 N.E.2d 859 (2001); *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 73. "[A] ruling on a challenge to a juror for cause, pursuant to R.C. 2313.17(B)(9) or 2313.17(D)[,] will not be overturned on appeal unless it appears that the trial court abused its discretion." *Cordova,* 2017-Ohio-7245, 96 N.E.3d 906, at ¶ 20. An abuse of discretion occurs when the trial court's decision is unreasonable, arbitrary or unconscionable. *Id.* at ¶ 21.

{¶38} In this case, appellants did not object to any of the questions the trial court asked potential jurors during voir dire and did not raise an objection to the trial court's excusal of prospective juror No. 3 for cause below. They have, therefore, waived all but plain error. *See, e.g., Sanderfer v. Cuyahoga Metro. Hous. Auth.*, 8th Dist. Cuyahoga No. 104720, 2017-Ohio-1552, ¶ 8, citing *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 210, 436 N.E.2d 1001 (1982), and *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121-123, 679 N.E.2d 1099 (1997). Review for plain error is to be conducted "with the utmost caution." *Goldfuss* at 121. Plain error is limited to those "extremely rare cases" in which "exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a materially adverse effect on the character of, and public confidence in, judicial proceedings." *Id.* at 121; *see also Citizens Bank, N.A. v. Conway*, 8th Dist. Cuyahoga No. 106315, 2018-Ohio-2229, ¶ 16.

{¶39} Appellants argue that a "review of the questions posited by the trial court clearly demonstrates that the trial court improperly conveyed to potential jurors, [its] belief that the Plaintiffs were entitled to substantial damages" and that the trial court's voir dire questions and

subsequent excusal of prospective juror No. 3 "affect[ed] the basic fairness of the judicial process," constituting plain error.   We disagree.

{¶40} Prospective juror No. 3 joined the panel of prospective jurors after several challenges were exercised as to other potential jurors.   When prospective juror No. 3 joined the panel of prospective jurors, the trial court inquired whether there was anything he wanted to bring to the court's or the parties' attention based on the questions he had heard asked of the other prospective jurors that day.   Prospective juror No. 3 responded that he was "[n]ot really in favor of eight-digit payments."   The trial court proceeded to ask prospective juror No. 3 a series of questions directed to determining whether his disfavor of eight-digit verdicts meant that he would not award an eight-digit verdict even if the evidence warranted it.   At the conclusion of this initial round of questioning, the trial court stated:

> THE COURT: [I]t's not fair to anybody if someone is going to sit there and say I can't do that. That's too much money.   It just can't be done.
>
> You understand that?
>
> JUROR NO. 3:   Yeah.
>
> THE COURT: So if you're there, if you're there where you're saying I don't care what you show me, I'm never going to give an eight-figure award, then you need to speak that out; but what I was hearing you tell me was I'll give it, but you just better bring the bacon and show me that it's worth it.
>
> JUROR NO. 3: Yes.
>
> * * *
>
> THE COURT: And I don't have any problem with you saying you're going to make them earn it, but I have a real problem with saying there's no way you could ever do it.
>
> JUROR NO. 3:   I understand.

**{¶41}** After the trial court completed its initial round of questioning, appellees' counsel questioned prospective juror No. 3. During counsel's questioning, prospective juror No. 3 once again expressed his "skepticism" of large damages awards. He stated that he didn't know whether he "believe[d] in" punitive damages, questioned how one could "put a price on" pain and suffering and indicated that intentional conduct was "more what [he was] thinking" would be required before he could award an eight-digit verdict. The trial court followed up on counsel's questions and engaged in a further colloquy with prospective juror No. 3 to determine whether he could be "fair and impartial" and would "follow the law":

> THE COURT: * * * You have to be able to ensure me and more importantly, yourself that if you're chosen to serve on this panel to hear this case that you can be fair and impartial, and you will award a verdict that's consistent with the damages that are presented to you, no matter what that number may be, and you're going to follow the law.
>
> I don't care if you come back and award nine zillion dollars. That's not the issue of what the award's going to be. The issue is going to be that you have the capacity to do that.
>
> * * *
>
> And I'm saying to you right now that if this firm, this law firm that puts on this case, these lawyers, they present a case to you, and they do what they're expected to do, and they do what they believe they need to do, and that supports an eight figure verdict, are you going to be able to come back and give them that eight-figure verdict, or are you going to say, when you're back with your fellow jurors, "That's too much money. I can't do it." Which one are you? Tell me.
>
> JUROR NO. 3: I think I'll say it's too much money.

**{¶42}** Although the focus of the trial court's questioning of prospective juror No. 3 was on whether prospective juror No. 3 could follow the law and award the amount of damages shown to be warranted by the evidence — whatever that amount might be — the trial court had previously made it clear to the prospective jurors that they would only reach the issue of damages

if they first found liability on the part of appellants. There is nothing in the record to suggest that the trial court improperly "conveyed to potential jurors" a belief that appellees were "entitled to substantial damages."

{¶43} Based on the record before us and giving deference to the trial court, which saw and heard prospective juror No. 3, we cannot say that the trial court abused its discretion — much less committed plain error — in probing the basis of the juror's reticence toward awarding significant damages during voir dire and ultimately excusing prospective juror No. 3 for cause. Prospective juror No. 3's answers to the court's questions gave reasonable cause for concern that he could not be fair and impartial and would not follow the law, supporting a valid challenge under R.C. 2313.17.

{¶44} Accordingly, appellant's second assignment of error is overruled.

**Exclusion of Expert Testimony**

{¶45} In their third assignment of error, appellants contend that the trial court committed prejudicial error in precluding their expert, Dr. Jolliff, from testifying that, based on the results of the hospital's blood serum alcohol test, Hunt was "impaired" and was unable to operate a vehicle safely at the time of the accident. Appellants contend the excluded testimony was relevant to issues of comparative negligence and proximate cause. Appellees assert that the trial court properly limited Dr. Jolliff's testimony because his opinions regarding Hunt's impairment were not based on reliable scientific, technical or other specialized information and Dr. Jolliff had no factual basis upon which to opine that Hunt's alleged intoxication caused the accident.

{¶46} As with other evidence, a trial court has broad discretion in determining whether to admit or exclude expert testimony. *Herzner v. Fischer Attached Homes, Ltd.*, 12th Dist. Clermont No. CA2007-08-090, 2008-Ohio-2261, ¶ 7, citing *State v. Jones*, 90 Ohio St.3d 403,

414, 739 N.E.2d 300 (2000). The trial judge performs a "gatekeeping" role to ensure that expert testimony is sufficiently relevant and reliable to be presented to the jury. *See* Evid.R. 402, 702. The trial court must also balance the potential probative value of the evidence against the danger of unfair prejudice under Evid.R. 403. *Schaffter v. Ward*, 17 Ohio St.3d 79, 81, 477 N.E.2d 1116 (1985); *Licul v. Swagelok Co.*, 8th Dist. Cuyahoga No. 86322, 2006-Ohio-711, ¶ 21; *Knowlton v. Schultz*, 179 Ohio App.3d 497, 2008-Ohio-5984, 902 N.E.2d 548, ¶ 33-34 (1st Dist.). Evid.R. 403(A) mandates the exclusion of even relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury.

{¶47} The party offering expert testimony has the burden of establishing its admissibility. *See, e.g., Marcus v. Rusk Heating & Cooling, Inc.*, 12th Dist. Clermont No. CA2012-03-026, 2013-Ohio-528, ¶ 27; *State v. Ream*, 3d Dist. Allen No. 1-12-39, 2013-Ohio-4319, ¶ 82. Absent an abuse of discretion that materially prejudices a party, a trial court's decision to admit or exclude evidence "'will stand.'" *Rieger v. Giant Eagle, Inc.*, 2018-Ohio-1837, 103 N.E.3d 851, ¶ 45 (8th Dist.), quoting *Krischbaum v. Dillon*, 58 Ohio St.3d 58, 66, 567 N.E.2d 1291 (1991).

{¶48} Two trial judges primarily presided over this case — the trial judge originally assigned to the case, who handled the pretrial proceedings (the "assigned judge"), and a visiting judge, who presided over the trial and ruled on post-trial motions (the "visiting judge").[2]

{¶49} Prior to trial, appellees filed several motions in limine, including motions in limine to preclude appellants from (1) introducing expert testimony based on their failure to offer experts for depositions, (2) "asserting intoxication as a defense" and (3) introducing evidence

regarding Hunt's alleged alcohol consumption and arrest for driving under the influence ("DUI") in connection with the accident.[3]

**{¶50}** Appellees argued that because the DUI charge against Hunt had been dismissed, any evidence that he was arrested for or charged with a DUI was highly prejudicial and should be excluded. Appellees further argued that evidence of Hunt's blood serum alcohol test should be excluded because it was unreliable and there was no evidence that Hunt was actually impaired or intoxicated at the time of the accident. Appellees also argued that appellants should be precluded from raising an "intoxication defense," asserting that any such defense could be based only on conjecture and speculation. Appellants opposed the motions.

**{¶51}** Before the case was "spun" to the visiting judge for trial, the assigned judge ruled on the parties' motions in limine. The assigned judge granted appellees' motion in limine to exclude evidence of Hunt's arrest for DUI and denied appellees' motions in limine to preclude appellants from presenting expert testimony, from asserting intoxication as a defense and from introducing evidence of Hunt's alleged alcohol consumption. The assigned judge did not explain the reasoning for his rulings on the motions in limine.

**{¶52}** Before trial commenced, the parties attempted to revisit the assigned judge's rulings on several of their motions in limine with the visiting judge, including the assigned judge's rulings with respect to the admissibility of testimony by appellants' expert, Dr. Jolliff. Appellees argued that they had only recently learned that appellants intended to call Dr. Jolliff as a witness at trial. They also claimed that his testimony should be excluded because he had used

---

[2] The administrative judge ruled on appellees' motion for prejudgment interest.

[3] Ten months after the accident, Hunt was charged with driving under the influence. That charge was later dismissed.

a "questionable methodology" in formulating his opinions and the blood test he relied upon was unreliable.

{¶53} The visiting judge deferred to the assigned judge's rulings and indicated that Dr. Jolliff would be permitted to testify at trial. However, to address appellees' concern that Dr. Jolliff had only recently been identified as a trial witness and had not been made available for a discovery deposition, the visiting judge ordered that Dr. Jolliff be subject to a discovery deposition before videotaping his testimony for trial. The visiting judge continued the trial a day so that this could occur.

{¶54} After the parties videotaped Dr. Jolliff's trial testimony, appellees asked the visiting judge to rule on their objections. Appellees objected to portions of Dr. Jolliff's videotaped trial testimony on the grounds that he was testifying regarding matters that were outside the scope of his expert report and was offering opinions regarding Hunt's alleged "impairment" that were to have been excluded based on the trial court's previous rulings on appellees' motions in limine. The visiting judge heard from the parties and separately ruled on each objection. Where the visiting judge sustained appellees' objections, those portions of Dr. Jolliff's videotaped trial testimony were redacted and not played for the jury.

{¶55} In their brief, appellants cite to only the following testimony by Dr. Jolliff as being improperly excluded at trial:

> [COUNSEL]: Okay. So you still, despite the questions put to you by opposing counsel, are of the opinion that whatever his alcohol level was, Mr. Hunt was impaired in terms of safely operating his vehicle, correct?
>
> A. With the alcohol level that's demonstrated here, I agree, yes.

{¶56} For each assignment of error presented for review, an appellant is required to identify the specific parts of the record where the alleged error occurred. *See* App.R. 16(A)(7)

(requiring that appellant's brief include "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies"). "This rule is designed 'to aid the reviewing court in determining whether any reversible error occurred in the lower court by having the complaining party specify the exact location(s) where such a determination can be made.'" *Mayfair Village Condominium Owners Assn. v. Grynko*, 8th Dist. Cuyahoga No. 99264, 2013-Ohio-2100, ¶ 6, quoting *Hildreth Mfg. v. Semco, Inc.*, 151 Ohio App.3d 693, 2003-Ohio-741, 785 N.E.2d 774, ¶ 32 (3d Dist.). An appellate court may disregard an assignment of error when the appellant fails to identify the relevant portions of the record upon which an assignment of error is based. *See* App.R. 12(A)(2) ("The court may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based * * *."); *see also Mayfair Village Condominium Owners Assn.* at ¶ 6 (An appellate court is "not obliged to scour the record in search of evidence to support an appellant's assignment of error."), citing *Nob Hill E. Condominium Assn. v. Grundstein*, 8th Dist. Cuyahoga No. 95919, 2011-Ohio-2552, ¶ 11.

{¶57} The trial court permitted Dr. Jolliff to testify regarding the results of Hunt's blood serum alcohol test, how hospitals typically perform blood serum alcohol tests, his belief that the test results were valid and accurate, how he converted Hunt's blood serum alcohol level to a whole blood alcohol level and the results of that conversion — i.e., a whole blood level somewhere in the range of 104.2 milligrams per deciliter to 113.6 milligrams per deciliter, with 108.9 milligrams per deciliter (0.109 grams per deciliter) as the median. The trial court also

permitted Dr. Jolliff to testify regarding how people generally metabolize alcohol and that, based on the test results, Hunt's blood serum alcohol level was "elevated":

We have a lot of science on motor vehicle operation and also * * * impairing effects of alcohol and basing it on levels that are drawn. Mr. Hunt's level was 125 milligrams per deciliter, or 0.125 grams per liter, which was elevated.

{¶58} However, the trial court did not allow Dr. Jolliff to testify to matters outside the scope of his expert report. The trial court also precluded Dr. Jolliff from opining that Hunt was "driving outside the legal limits" and that the "elevated" nature of Hunt's blood alcohol serum level meant that Hunt was "intoxicated" or "impaired" at the time of the accident.

{¶59} On the record before us, we cannot say that the trial court abused its discretion in excluding the testimony at issue.

{¶60} The sole basis for Dr. Jolliff's opinion that Hunt was impaired at the time of the accident was the results of Hunt's blood serum alcohol test. According to Dr. Jolliff, the test results indicated that they were "presumptive only"; no confirmation testing of the results had been done. By the time of trial, the hospital where the blood serum alcohol test had been administered was closed such that there was no one who could authenticate the test results.

{¶61} No field sobriety tests were performed on Hunt. There is no evidence that anyone smelled alcohol on Hunt or observed anything to suggest that Hunt was intoxicated or impaired from alcohol use at the time of the accident. Dr. Jolliff had no information regarding what or how much Hunt had to drink that evening or over what period of time he had been drinking. Likewise, he had no information regarding Hunt's behavior or his physical or mental condition prior to the accident. Dr. Jolliff had no opinion as to what caused the crash and could not state that Hunt's alleged impairment had a causative role in the crash.

**{¶62}** Further, the particular testimony appellants identify in their brief as having been improperly excluded at trial was elicited during appellants' counsel's redirect examination of Dr. Jolliff. The reason this testimony was not offered at trial was not due solely to the trial court's rulings on appellees' motions in limine. This testimony was excluded because appellees decided not to cross-examine Dr. Jolliff. Although appellees had conducted a cross-examination of Dr. Jolliff as part of his videotaped trial testimony, at trial, they decided not to cross-examine him. Accordingly, only the direct examination portion of Dr. Jolliff's previously videotaped trial testimony was admitted into evidence and played for the jury. The cross-examination and redirect examination portions of his videotaped trial testimony were not admitted into evidence and were not played for the jury.

**{¶63}** Accordingly, we overrule appellants' third assignment of error.

**Exclusion of Evidence of Criminal Record of Witness**

**{¶64}** In their fourth assignment of error, appellants argue that the trial court abused its discretion by refusing to admit "hard copy evidence" of Douglas' prior convictions under Evid.R. 609. Appellants contend that they should have been permitted to introduce certified copies of journal entries in two Cuyahoga County Common Pleas Court cases, reflecting Douglas' prior convictions for felonious assault and a drug-related charge, into evidence for impeachment purposes.

**{¶65}** A witness may be impeached by proof of a prior conviction in accordance with Evid.R. 609. That rule provides, in relevant part:

(A) General rule. For the purpose of attacking the credibility of a witness:

(1) Subject to Evid.R. 403, evidence that a witness other than the accused has been convicted of a crime is admissible if the crime was

punishable by death or imprisonment in excess of one year pursuant to the law under which the witness was convicted.

(2) Notwithstanding Evid.R. 403(A), but subject to Evid.R. 403(B), evidence that the accused has been convicted of a crime is admissible if the crime was punishable by death or imprisonment in excess of one year pursuant to the law under which the accused was convicted and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

(3) Notwithstanding Evid.R. 403(A), but subject to Evid.R. 403(B), evidence that any witness, including an accused, has been convicted of a crime is admissible if the crime involved dishonesty or false statement, regardless of the punishment and whether based upon state or federal statute or local ordinance.

(B) Time limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement, or the termination of community control sanctions, post-release control, or probation, shock probation, parole, or shock parole imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. * * *

{¶66} Evid.R. 609(F) specifies the methods by which a party may prove a conviction of a crime for purpose of impeaching a witness. That rule provides:

When evidence of a witness's conviction of a crime is admissible under this rule, the fact of the conviction may be proved only by the testimony of the witness on direct or cross-examination, or by public record shown to the witness during his or her examination. If the witness denies that he or she is the person to whom the public record refers, the court may permit the introduction of additional evidence tending to establish that the witness is or is not the person to whom the public record refers.

{¶67} In this case, Douglas was questioned regarding his criminal record both during his direct and cross-examinations. He freely admitted that he had pled guilty to a felonious assault charge in 2010 and a drug-related charge in 2006. During his cross-examination, appellants' counsel not only questioned Douglas regarding his criminal record, she also showed

him copies of the journal entries relating to his convictions and had him read from them. Appellants' counsel then sought to have the copies of the journal entries admitted into evidence as exhibits. The trial court refused to do so on the ground that Douglas had already testified as to his criminal convictions. The trial court stated: "You can talk about what [Douglas] testified to all you want but his [criminal] record [is] * * * not going back [to the jury]."

{¶68} In this case, consistent with Evid.R. 609(F), appellants were permitted to prove Douglas' prior convictions both by questioning him and showing him the journal entries relating to his convictions during his cross-examination. Appellants have not shown that the trial court abused its discretion in refusing to admit the "hard copies" of the journal entries into evidence. Further, given that Douglas testified regarding his convictions, appellants have not demonstrated that they were in any way prejudiced by the trial court's ruling. Appellants' fourth assignment of error is overruled.

**Alleged Juror Misconduct**

{¶69} In their fifth assignment of error, appellants argue that the trial court abused its discretion in failing to grant a mistrial after a juror provided tissues to two witnesses who began crying during their testimony. Appellants further contend that they were prejudiced by this "extreme juror misconduct." Appellants' argument is meritless.

{¶70} The first instance of alleged juror misconduct occurred during Conard's direct examination. While testifying regarding her injuries and the pain she has experienced since the accident, Conard began crying. The record reflects that juror No. 5 "[h]and[ed] tissues" for the crying witness.[4] The second instance of alleged juror misconduct occurred during the testimony

---

[4] It is unclear from the record whether the juror handed tissues to Conard directly or whether she handed them to Conard's attorney to give to Conard. Appellants assert that the juror left the jury box and handed a box of tissues to Conard directly. Appellees contend that the juror handed a box of tissues to appellees' counsel to give to

of Hunt's sister, Doris Riffe.[5]   Riffe began crying as she described what occurred when Hunt "finally woke up" after the accident and asked for her.   Once again, the record reflects that juror No. 5 "[h]and[ed] tissues" for the crying witness.[6]

**{¶71}** First, we do not agree with appellants' characterization of the juror's actions in this case as "misconduct."   Offering a tissue to someone who is crying is a simple act of common courtesy — not misconduct.   Appellants have not cited a single case in which similar actions by a juror were found to constitute juror misconduct warranting a mistrial.   Second, appellants did not object to the juror's actions or request a mistrial at the time the incidents occurred.   Accordingly, appellants waived all but plain error, which has not been established here.   *See, e.g., Sanderfer*, 8th Dist. Cuyahoga No. 104720, 2017-Ohio-1552, at ¶ 8; *Goldfuss,* 79 Ohio St.3d at 121-123, 679 N.E.2d 1099.

**{¶72}** Third, appellants have not shown that the juror's actions prejudiced appellants in any way.   Contrary to appellants' assertions, neither the fact that juror No. 5 ultimately became the jury foreperson nor the fact that the jury submitted questions to the court during their deliberations relating to damages establishes that the juror No. 5's actions in providing tissues to two crying witnesses "clearly affected the jury verdict."   We overrule appellants' fifth assignment of error.

---

Conard.

[5] In their brief, appellants assert that the first instance of this alleged juror misconduct occurred during the testimony of Margaret Wyatt (Hunt's younger sister).   However, the trial transcript reflects that juror No. 5 first provided tissues to Conard and that she later provided tissues to Doris Riffe (Hunt's oldest sister).   There is no indication in the trial transcript that juror No. 5 provided tissues to Wyatt.   Both Wyatt and Riffe testified after Conard.

[6] Once again, it is unclear from the record whether juror No. 5 handed the tissues directly to the witness. In their reply brief, appellants assert that when the juror "approached a 'distraught' Ms. Margaret Wyatt [sic]," the bailiff "intercepted" the juror, took the box of tissues from her and handed them to the witness.

**Manifest Weight of the Evidence — Hunt's Failure to Look Left**

{¶73} In their sixth assignment of error, appellants contend that the jury's verdict in favor of appellees is against the manifest weight of the evidence because Hunt testified that he looked only to the right — and did not look to the left — before his vehicle was struck by Officer Carroscia's vehicle.

{¶74} The manifest weight of the evidence involves a party's burden of persuasion. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19, 23. In assessing whether a jury's verdict is against the manifest weight of the evidence, we examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the jury "'clearly lost its way and created such a manifest miscarriage of justice'" that the verdict must be overturned and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380,387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983); *Eastley* at ¶ 17-20.

{¶75} When reviewing conflicting testimony, an appellate court is guided by a presumption that the findings of the trier of fact are correct. *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). This presumption arises because the trier of fact had an opportunity "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Id.* Thus, "to the extent that the evidence is susceptible to more than one interpretation," we will "construe it consistently with the jury's verdict." *Berry v. Lupica*, 196 Ohio App.3d 687, 2011-Ohio-5381, 965 N.E.2d 318, ¶ 22 (8th Dist.), citing *Ross v. Ross*, 64 Ohio St.2d 203, 414 N.E.2d 426 (1980); *see also Seasons Coal* at 80, fn. 3 ("'[I]n determining

whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * * If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'"), quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-192 (1978).

**{¶76}** Appellants assert that Hunt's testimony that he did not look both ways before entering the intersection could only be reasonably interpreted as a failure to exercise due care and that a reasonable factfinder should have found that Hunt's own negligence in failing to look left before entering the intersection was the proximate cause of the accident.

**{¶77}** But Hunt, Conard and Douglas all testified that the traffic light facing Hunt was green as he entered the intersection. They further testified that Officer Carroscia's emergency lights and sirens were not activated as he approached the intersection. If their testimony is believed, there was no reason for Hunt to look left before proceeding through the intersection. Hunt testified that he looked to the right as he entered the intersection because there was an inoperable traffic light to the right of the functioning traffic signal controlling the traffic in his direction. Hunt further testified that he did not look left because he did not have time to do so. As he was looking right, his vehicle was struck on the driver side by Officer Carroscia's vehicle.

**{¶78}** As Hunt explained:

[COUNSEL]: Mr. Hunt, why didn't you look to the left?

A. 'Cause I looked to the right first.

Q. Why didn't — is that the reason you did not look to the left?

A. It was two traffic lights. The one on the right side was out. I think anybody's

first thought would look that way 'cause it's out.   I never got a chance to look to the left.

**{¶79}** Although appellants offered conflicting evidence — Officer Carroscia and Sergeant Gardner testified that Officer Carroscia had the green light and that he had his emergency lights and sirens activated as he approached the intersection — it was for the jury to decide whom and what to believe.   Following a thorough review of the record, we cannot say that, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the verdict must be overturned and a new trial ordered.   The jury's verdict was not against the manifest weight of the evidence, and we decline to disturb it.

**{¶80}**   Appellants' sixth assignment of error is overruled.

**Evidence of Insurance Benefits**

**{¶81}** In their seventh assignment of error, appellants contend that the trial court abused its discretion in precluding them from questioning Hunt's sister, Margaret Wyatt, regarding various "insurance set-offs" Hunt received as a result of the accident.   Appellants contend that they were entitled to introduce such evidence at trial pursuant to R.C. 2744.05(B)(1).   That provision provides, in relevant part:

> If a claimant receives or is entitled to receive benefits for injuries or loss allegedly incurred from a policy or policies of insurance or any other source, *the benefits shall be disclosed to the court*, and the amount of the benefits shall be deducted from any award against a political subdivision recovered by that claimant. No insurer or other person is entitled to bring an action under a subrogation provision in an insurance or other contract against a political subdivision with respect to those benefits.
>
> The amount of the benefits shall be deducted from an award against a political subdivision under division (B)(1) of this section regardless of whether the claimant may be under an obligation to pay back the benefits upon recovery, in whole or in part, for the claim. * * *

(Emphasis added.)

**{¶82}** As the statute clearly indicates, the means by which a political subdivision obtains a credit or setoff for insurance benefits is through "disclos[ure]" of such benefits "to the court" — not by presenting evidence for the jury's consideration at trial. As this court explained in *Jones v. MetroHealth Med. Ctr.*, 2017-Ohio-7329, 89 N.E.3d 633 (8th Dist.):

> R.C. 2744.05(B) requires a post-trial hearing in which the trial judge is authorized to hear additional evidence. The text of R.C. 2744.05(B)(1) states that if a claimant receives or is entitled to receive benefits for injuries or loss, those benefits "shall be disclosed to the court[.]" Although the statute does not explicitly state who has the duty to disclose a claimant's receipt of benefits, the claimant, as the party in receipt of the benefits that might be subject to offset, would be in the best position to make disclosure to the court.
>
> We also believe that R.C. 2744.05(B)(1) requires a post-trial proceeding because mandatory offset implicates the collateral source rule — the jury's knowledge that a political subdivision might be entitled to a statutory damages deduction could improperly affect its determination of damages. What is more, evidence going to a political subdivision's status at trial would be irrelevant to the underlying action. For these reasons, we hold that R.C. 2744.05(B) sanctions a bifurcated proceeding where the court, not the jury, decides the amount that must be offset from a damage award against a political subdivision for any benefits a claimant has received, or is entitled to receive, for a loss or injury.

*Id.* at ¶ 19-20. Accordingly, appellants were not entitled to introduce evidence of any insurance offsets to which they might entitled under R.C. 2744.05(B)(1) through the testimony of witnesses at trial. Appellants' seventh assignment of error is overruled.

**Motion for New Trial**

**{¶83}** In their eighth and final assignment of error, appellants contend that the trial court erred in denying their motion for a new trial because (1) the record demonstrates that Officer Carroscia was on an emergency call at the time of the accident; (2) there was no evidence that Officer Carroscia acted with malicious purpose, in bad faith or in a willful, wanton or reckless manner and (3) the trial court improperly admitted the expert report of Detective Rice into

evidence.

{¶84} As an initial matter, we note that, in their brief, appellants frequently cite to the summary judgment record rather than the trial court record to support their arguments. It is, however, the evidence that was presented at trial, not what was presented at summary judgment, that matters at this stage of the proceedings. For this reason alone, we could disregard appellants' assignment of error. *See* App.R. 12(A)(2); App.R. 16(A)(7). Even if we were to consider appellants' arguments, however, we would find no error by the trial court in denying appellants' motion for a new trial.

{¶85} Civ.R. 59(A) sets forth the grounds for granting a new trial. Civ.R. 59(A)(6) — the section under which it appears appellants contend the trial court should have granted a new trial — provides that "[a]new trial may be granted to all or any of the parties and on all or part of the issues" where "[t]he judgment is not sustained by the weight of the evidence." The decision whether to grant a new trial under Civ.R. 59(A)(6) is within the sound discretion of the trial court and will not be reversed absent a showing that its decision was unreasonable, arbitrary or unconscionable. *Shaw Steel, Inc. v. Ronfeldt Mfg., L.L.C.*, 8th Dist. Cuyahoga No. 102665, 2016-Ohio-1117, ¶ 36; *Yungwirth v. McAvoy*, 32 Ohio St.2d 285, 286, 291 N.E.2d 739 (1972).

{¶86} With respect to the liability of East Cleveland, R.C. 2744.02(B) provides in relevant part:

> Subject to sections 2744.03 and 2744.05 of the Revised Code, a political subdivision is liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by an act or omission of the political subdivision or of any of its employees in connection with a governmental or proprietary function, as follows:
>
>> (1) Except as otherwise provided in this division, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees when the

employees are engaged within the scope of their employment and authority. The following are full defenses to that liability:

> (a) A member of a municipal corporation police department or any
>
> other police agency was operating a motor vehicle while
>
> responding to an emergency call and the operation of the vehicle
>
> did not constitute willful or wanton misconduct * * *.

{¶87} Officer Carroscia's individual liability is governed by R.C. 2744.03(A)(6). *Cramer v. Auglaize Acres*, 113 Ohio St.3d 266, 2007-Ohio-1946, 865 N.E.2d 9, ¶ 17. Pursuant to R.C. 2744.03(A)(6), an employee of a political subdivision is immune from liability unless: (1) the employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (2) the employee's acts or omissions were with malicious purpose, in bad faith, or wanton or reckless or (3) civil liability is expressly imposed upon the employee by another section of the Revised Code.

{¶88} Thus, even assuming Officer Carroscia was on an emergency call at the time of the accident, appellants could still be liable for any injuries caused by Officer Carroscia if Officer Carroscia was found to have acted wantonly and/or willfully and recklessly.[7]

{¶89} "Wanton misconduct" has been defined as "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 33, citing *Hawkins v. Ivy*, 50 Ohio St.2d 114, 117-118, 363 N.E.2d 367 (1977), and *Black's Law Dictionary* 1613-1614 (8th Ed.2004) (explaining that one acting in a wanton manner

---

[7]Appellees have not argued that Officer Carroscia acted with malicious purpose or in bad faith. Likewise, there is no claim that Officer Carroscia's actions were "manifestly outside the scope of [his] employment or official responsibilities" or that civil liability is expressly imposed by another section of the Revised Code. Accordingly, we do not address those issues here.

is aware of the risk of the conduct but is not trying to avoid it and is indifferent to whether harm results); *see also Hunt*, 8th Dist. Cuyahoga No. 103468, 2016-Ohio-3176, at ¶ 22.

{¶90} "Willful misconduct" is "an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposely doing some wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Anderson* at ¶ 32, citing *Tighe v. Diamond*, 149 Ohio St. 520, 527, 80 N.E.2d 122 (1948), and *Black's Law Dictionary* at 1630 (describing willful conduct as the voluntary or intentional violation or disregard of a known legal duty); *see also Hunt* at ¶ 22.

{¶91} "Reckless conduct" involves "the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, at ¶ 34, citing *Thompson v. McNeill*, 53 Ohio St.3d 102, 104-105, 559 N.E.2d 705 (1990), and *Black's Law Dictionary* at 1298-1299 (explaining that reckless conduct is characterized by a substantial and unjustifiable risk of harm to others and a conscious disregard of or indifference to the risk, but the actor does not desire harm); *see also Hunt* at ¶ 26. The jury was instructed regarding each of these definitions.

{¶92} In this case, there is substantial competent, credible evidence in the record upon which the jury could have reasonably found that Officer Carroscia acted wantonly, willfully and recklessly in causing the accident at issue. As detailed above, appellants presented evidence that Officer Carroscia (1) was operating his vehicle at a high rate of speed (2) under a suspended license (3) without his lights and sirens activated (4) in an area in which there was a gas station open for business and a number of patrons frequenting bars and (5) ran a red light, crashing into Hunt's vehicle. There is also evidence that Officer Carroscia failed to follow applicable policies

and procedures designed to protect the safety of the public and police officers. *See Anderson* at ¶ 37 ("the violation of a statute, ordinance, or departmental policy enacted for the safety of the public is not per se willful, wanton, or reckless conduct, but may be relevant to determining the culpability of a course of conduct").

{¶93} Although appellants offered conflicting testimony, once again, it was for the jury to decide whom and what to believe.

{¶94} Appellants also contend that they should have been granted a new trial based on the trial court's admission of Officer Rice's expert report. However, Officer Rice's expert report was not, in fact, admitted into evidence at trial. Accordingly, appellants' argument is meritless.

{¶95} Based on the record before us, we cannot say that the trial court acted unreasonably, arbitrarily or unconscionably in denying appellants' motion for a new trial. We overrule appellants' eighth assignment of error.

{¶96} Judgment affirmed.

It is ordered that appellees recover from appellants the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
EILEEN A. GALLAGHER, JUDGE

MARY EILEEN KILBANE, A.J., and
MICHELLE J. SHEEHAN, J., CONCUR